FILED 21 JUN '11 16:29 USDC-ORE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | | |
|---|---|---|
| BEAVER STATE MOTORCYCLES, LLC, and OREGON TRAILS MOTORCYCLES, LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil No. 10-6188-HO |
| v. | ) ) | ORDER |
| BMW (US) HOLDING CORP, and BMW OF NORTH AMERICA, LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiffs Beaver State Motorcycles and Oregon Trail Motorcycles bring this suit for declaratory relief against BMW alleging violation of ORS § 650.158 which provides, in part:

(1) Each manufacturer, distributor or importer shall specify in writing to each of its dealers in this state:

(a) The dealer's obligations for predelivery preparation and warranty service on motor vehicles of the manufacturer, distributor or importer;

(b) The schedule of compensation to be paid the dealer for parts, work and service in connection with predelivery preparation and warranty service; and

(c) The time allowances for the performance of the predelivery preparation and warranty service.

(2) A schedule of compensation shall include reasonable compensation for diagnostic work, repair service and labor. Time allowances for the diagnosis and performance of predelivery and warranty service shall be reasonable and adequate for the work to be performed. The hourly rate paid to a dealer shall not be less than the rate charged by the dealer to nonwarranty customers for nonwarranty service and repairs. Reimbursement for parts, other than parts used to repair the living facilities of motor homes, purchased by the dealer for use in performing predelivery and warranty service shall be the amount charged by the dealer to non-warranty customers, as long as that amount is not unreasonable.

Specifically, plaintiffs seek reimbursement for warranty work at the labor rate charged to non-warranty customers, reimbursement for test rides related to warranty work at the rate charged non-warranty customers, reimbursement for third party parts, including Code 3 parts, related to warranty work at the rate charged non-warranty customers,[1] and reimbursement for service and supply expenses related to warranty work at the rate charged non-warranty customers.[2]  Both parties move for summary judgment.

---

[1]Plaintiffs concede that they are unaware of any third party parts, other then Code 3 parts, that are at issue.

[2]To determine whether plaintiff is entitled to declaratory relief, the court must construe the statute in question. The first step in interpreting a statute is an examination of the text and its context. PGE v. Bureau of Labor and Industries, 317 Or. 606, 610-11, (1993). The second step is consideration of pertinent legislative history that a party may proffer. ORS § 174.020. (continued...)

A.  Code 3 Parts

Plaintiffs contend that defendant reimburses for some parts at the suggested retail price and other parts at cost only. Specifically, plaintiffs contend that defendant reimburses third party parts, including Code 3 parts, at cost only. Because plaintiff makes less from warranty work compared to non-warranty work, they argue that defendants have violated the above statute. However, the statute does not require, as plaintiffs contend, defendant to reimburse plaintiffs for parts not covered by their warranty. Plaintiffs, in essence, concede this issue when they argue if a distributor uses its power to mandate a dealer's obligations with respect to warranty work, that warranty work is subject to the statute. Defendants do not mandate the warranty work on Code 3 parts, Code 3 covers the warranty.

Code 3 parts are not warranted by defendant. Warranty Policy and Procedures Manual attached to Declaration of Madelyn Russell (#25) as Exhibit 1 at p. 42 (Warranty does not apply to Code 3 Emergency Products). The statute requires the manufacturer to

---

²(...continued)
Finally, if the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty.  PGE 317 Or. at 612.  The parties in this case offer little in the way of an examination of the statute, thus the parties apparently believe the statute is clear on its face.  The Oregon legislature designed the statute at issue to level the playing field between dealers and manufacturers. However, the statute was not intended to legitimize up-charging on a dealer's whim.

3 - ORDER

specify in writing the warranty on the vehicle of the manufacturer. Defendant has done that in specifically excluding Code 3 parts.

Code 3 PSE manufactures and warrants its own products which are manufactured for use on motorcycles of various manufactures including defendant. Code 3 uses defendant to act as a claim processing facilitator for the Code 3 warranty,[3] but the warranty obligations are explicitly those of Code 3 and not defendant. Indeed, defendant's service bulletin provided to plaintiffs indicates that Code 3 is completely separate from BMW and the Code 3 warranty is not to be confused with the warranty BMW provides. The bulletin then outlines how to process (computerized) a warranty claim for Code 3 parts through BMW as a processor only. Service Bulletin attached to Declaration of Scott Russell (#30). Dealers may also work directly with Code 3 on warranty issues through a manual process. Because defendant has specified, in writing, that Code 3 parts are not covered by its warranty, as required by ORS § 650.158(1), it is not obligated to compensate dealers in accordance with ORS § 650.158(2). Therefore, defendant is entitled to summary judgment with respect to Code 3 parts.

---

[3]Daniel Drury, director of quality and service for Code 3, states that Code 3 permits BMW motorcycle dealers to submit claims electronically through BMW NA's labor and parts claim system and that it reimburses BMW NA in accordance with its warranty letter agreement between Code 3 and BMW NA. That agreement sets labor rates and parts rates. Code 3 Warranty Letter Agreement attached as Exhibit C to Drury Declaration at p. 10 attached to memo in support of motion (#28). Drury further states that it determines the scope of its product warranty on all of the parts it manufactures.

4 - ORDER

## B. Shop Supplies

Plaintiffs assert they are required to purchase certain supplies and incur other expenses in performing warranty work. The supplies and expenses include brake cleaner, solvents, lubricants, propane/map gases, shop rags, flashlight batteries, latex/nitrile gloves, and hazardous waste disposal costs. Plaintiffs assert that non-warranty customers pay between $2.00 and $10.00 for hazardous materials disposal and up to 10% of their labor cost for shop supplies. Plaintiffs contend that defendant's reimbursement policy for these expenditures items violates ORS § 650.158(2) because it is below the rate charged to non-warranty customers.

Plaintiffs repair orders itemize for labor, parts, sublet, shop supplies, and hazardous materials separately. The statute requires defendant to specify its schedule of compensation to be paid the dealer for parts, work and service in connection with warranty service. Defendant's Warranty Policy and Procedures Manual provides that labor will be reimbursed at rate up to but not exceeding a dealers retail rate or a rate that is both fair and reasonable. Warranty Policy and Procedures attached to Declaration of Madelyn Russell (#25) as Exhibit 1 at p. 80. Sublet materials such as required fluids, shop supplies, brake cleaner, oil, etc, that are consumed, required or installed as a direct result of the line on the repair order are covered under warranty as follows:

• Only that portion of a material, fluid, or supply required and quantifiable for the repair is chargeable to the repair order and to warranty.

• If sold in a container with more than required for the repair, claim the portion required for the repair (at dealer net plus 40% if available from BMW or at dealer net plus 20% if not available from BMW).

• Unless there is a technical reason to the contrary, fluids should be captured and reused if their temporary removal is needed to accomplish a repair.

• Topping off a fluid is covered when performed in conjunction with a warranty repair.

• A service manager may open a shop ticket to purchase containers of fluids and shop supplies that may have portions consumed during multiple repairs throughout the week. This alternative is one way to deal with bulk containers, fluids, glues, etc. with a short shelf life.

• Warranty does not cover items that are in general use throughout the day, not quantifiable, or not directly required for a line on the repair order. These items include, but are not limited to: hazardous waste disposal, shop rags, speedi dry, flashlight batteries, latex gloves, part washer tank fluids, quantities in excess of that required for the repair, etc.

Warranty Policy and Procedures attached to Declaration of Madelyn Russell (#25) as Exhibit 1 at p. 82.

Plaintiffs state they stopped attempting to track these supplies by repair because defendant told them it would never reimburse them for shop supplies regardless of how they track expenses. Plaintiff now contends that if defendant will reimburse them if properly quantified and tracked, then the court should grant plaintiffs' motion and declare defendant shall reimburse them at 10% of labor charges assessed. However, the complaint does not

6 - ORDER

ask for a declaration as to contractual obligations, but statutory obligations.

To the extent plaintiff's simply seek a declaration that shop supplies are reimbursable, they already are covered to the extent quantifiable under the Warranty Policy and Procedures. But, defendant contends that shop supplies are neither parts nor labor and thus not required to be reimbursed in a manner required by ORS § 650.158(2).

As noted above, plaintiff separately charges for labor, parts and supplies. The statute requires that time allowances for the diagnosis and performance of warranty service shall be reasonable and adequate and the hourly rate shall not be less than non-warranty work. Similarly, the statute requires that reimbursement for parts used in warranty service shall be the same as the amount charged by the dealer for non-warranty service. Thus, to the extent plaintiffs seek reimbursement at the same rate it charges for non-warranty repairs, the statute only requires such reimbursement for parts and labor.

Plaintiff contends that shop supplies (as well as hazardous waste materials charges) directly correlate to individual customer repairs. However, while the statute does require a compensation schedule for "repair service" it only requires reimbursement at the non-warranty rate for hours and parts. As noted above, defendant has provided the schedule with regard to shop supplies, and to the

extent such falls under "repair service," plaintiffs do not seek a declaration that the compensation is unreasonable.[4] Plaintiffs seek a declaration of reimbursement at non-warranty rates. Even plaintiffs' own billing to non-warranty customers indicates that shop supplies are neither hourly labor nor parts. Plaintiff's motion for summary judgment on this issue is denied, and defendants motion is granted.

## C. Test Rides

Plaintiffs contend that they are required to perform test rides prior to performing warranty work, to determine or confirm a customer complaint, and after repair is performed, to ensure that repair fully addresses the problem. Plaintiffs charge non-warranty customers no less than half an hour of technician time for test rides, but argue that defendant refuses to reimburse them for this time.

Defendant's Warranty Policy and Procedures Manual provides:

Road tests by the Service Advisor, shop foreman or quality control person where appropriate are an integral part of defining the complaint, repair request and/or verifying the quality and completion of the repair, and as such are generally not considered to be diagnostic time for the technician.

Exceptional cases where it is necessary for the technician to road test a vehicle in order to properly diagnose a verified complaint or defect may be considered

---

[4]Plaintiff's customary labor rate of $100 per hour is intended to generate sufficient revenue to operate the service department as its own business unit covering all expenses.

for warranty reimbursement when properly explained and
documented. A dedicated and identified time punch is
required as part of this documentation (see Time
Records/Time Control System, WPPM-8).

Warranty Policy and Procedures attached to Declaration of Madelyn
Russell (#25) as Exhibit 1 at pp. 85-86.

Plaintiffs seek a declaration that all test rides are
reimbursable, not just those necessary for a technician to properly
diagnose a complaint or defect.[5]

If this were a case in which plaintiffs openly charged its
non-warranty customers for routine test rides, this might be a
closer issue. However, because plaintiffs found there was a "push-
back from customers when they were being charged $500 [for] a five
hour service [and] charged an additional $50 to test ride their
vehicle when it was suggested by the manufacturer that should be
included," they would take half an hour and incorporate it in the
five-hour flat rate to bill for 5.5 hours of labor. Deposition of
Scott Russell at p. 26 (attached to Declaration #2 of James E.
Bartels (#47)). Plaintiffs' billings typically show a line for a
test ride but not a charge for the $50 under that line. A routine
test ride is not required by the warranty and at any rate is not
charged as a "test ride" to non-warranty customers and thus not
required by the statute to be reimbursed. Accordingly, plaintiff's

_____

[5]Plaintiffs state that if there is a fight over the sufficiency
of a particular request for reimbursement, that is a fight for
another day. For now, plaintiffs merely seek a declaration that
these expense are by statute subject to reimbursement.

motion for summary judgment as to routine test rides not required to be performed by a technician is denied.   Defendant already reimburses for required test rides on warranty work.

## D.   PUMA

Plaintiffs contend that they are required by defendant to correspond with defendant's staff through a technical web-based interface called Product and Measures Management Aftersales (PUMA) for some types of warranty repair, but that defendant refuses to reimburse for this time.[6]

PUMAs are required, with respect to plaintiffs, if after three hours of diagnosis, a technician has failed to identify the problem.   It appears that the parties agree that such time should be reimbursed, but plaintiffs provide no evidence that they have ever submitted a required PUMA and not been reimbursed.   Plaintiffs contend that they should be reimbursed whenever they deem it necessary to submit a PUMA.   The statute requires reasonable and adequate compensation for diagnostic work and manufacturers shall allow a reasonable time for the work to be performed with regard to warranty work. Again, plaintiffs confuse the need to compensate at the same "rate" as for non-warranty work as requiring compensation for any thing plaintiffs want to charge for.   There is no

---

[6]When required, depending on the complexity of the repair, a PUMA communication takes an average of five minutes per interaction.

10 - ORDER

allegation that the flat rate system employed by defendant with respect to warranty work, consisting of actual time, setting-up time, and additional time such as diagnosis, is unreasonable. The diagnostic and secondary activities comprise about 22% of the flat rate unit. The reasonableness of this system is confirmed by plaintiff's reliance on it for non-warranty repairs. The statute does not require defendants to reimburse PUMA time not required by the warranty so long as the time allowance for diagnosing warranty service is reasonable. Defendant's motion for summary judgment is granted on this issue.

## E. Attorney Fees

Because defendant's motion for summary judgement is granted on all issues, plaintiff's request for statutory attorney fees is denied.

## F. Motion to Show Cause Why Defendant is not in Contempt of the Stipulated Protective Order (#40)

Plaintiffs seek a hearing requiring defendant to show cause why it should not be adjudged in contempt of the parties' stipulated protective order and sanctioned. Plaintiffs ask for:

1. fines to be paid to plaintiffs if BMW violates the stipulated protective order in the future in the amount of $500 per violation;

11 - ORDER

2.   a   bar   preventing   defendant   from   using   information
obtained in violation of the stipulated protective order;

3.   defendant   to   provide   plaintiffs   with   a   list   of
plaintiffs'   customers   it   contacted   and   any   and   all   notes,
documents,   correspondence   or   communications   related   to   each
customer contact;

4.   an award of attorney fees necessitated by this motion.

The   stipulated protective order provides that information
designated as confidential shall be used solely for purposes of
litigation   between   the   parties   and   may   only   be   disclosed   to
attorneys (and their staff), to the extent necessary any officers
or employees of a party who is required to work on this litigation,
persons from whom testimony is taken, and court staff.

Plaintiffs contend that following production of confidential
information, defendant began contacting plaintiffs' customers in
violation of the protective order and that defendant's counsel even
contacted an owner of Plaintiff's, Scott Russell (who was himself
a customer).

Defendant responds that prior to the litigation, Scott Russell
contacted it with a labor rate request with invoices and repair
orders attached (the allegedly disclosed confidential materials)
and defendant declined to reimburse the rates requested.   Then
plaintiffs commenced this action in which plaintiffs alleged, among
other things, that test rides should be reimbursed, but defendant

noted that the invoices and repair orders previously provided did not actually show a charge for the test rides and, therefore, concluded that plaintiffs were asking for work at a rate that they in fact did not charge non-warranty customers.

Defendant deposed Russell who stated that because customers pushed back from being charged for test rides that plaintiffs simply added the $50 to the amount of labor charged for services performed. Defendant became concerned about unfair trade practices as a result. Therefore, using the invoices that had been supplied pre-litigation (but that were later provided in discovery and then marked as confidential) defendant contacted customers for whom test rides were performed to determine whether plaintiff's disclosed to the customers that they were being charged for a test ride. It is not clear if defendant actually disclosed any information to the customers or just used the information in obtaining customer identities. Using the information, appears to be permitted under the protective order, i.e., confidential information "shall be used solely for the purposes of litigation between the parties."

Russell himself was called, but apparently not actually reached, thus it is not clear if this is a violation the no contact of a represented person rule.

Defendant argues that it did not use confidential information since it contacted customers based on previously disclosed invoices. Plaintiffs counter that the information, even though

previously provided, was confidential at the time of the contacts. Further, plaintiffs contend that the documents cannot be disclosed in using them for litigation. However, as noted above, it is not clear that any actual disclosures of the information was made. More importantly the protective order itself provides:

12. Notwithstanding the designation [of] any documents, testimony, evidence, or other material as "CONFIDENTIAL," such material shall not he subject to this Order, if the substance thereof:

. . . .

has been made available to the recipient party by a third person who obtained it by legal means and without any obligation of confidence to the Disclosing Party.

Even though plaintiffs are the ones who provided the materials, it was prior to the institution of this litigation and thus the court construes the materials as not subject to the order by virtue of the previous disclosure without any obligation of confidence.

Plaintiffs must show by clear and convincing evidence, or at least something more than a preponderance of evidence, a violation of the order. This they have not done. The motion for sanctions is denied.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment (#22) is denied, plaintiffs' motion for an order of

14 - ORDER

contempt (#40) is denied, and defendant's motion for summary judgment (#33) is granted and this action is dismissed.

DATED this __21st__ day of June, 2011.

Michael C Hogan
United States District Judge